

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0984-08

**NOEL RONALDO VILLARREAL, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### IN CAUSE NO. 02-06-00393-CR FROM THE SECOND COURT OF APPEALS
### TARRANT COUNTY

**HERVEY, J., filed a concurring opinion in which KEASLER, J., joined.**

### CONCURRING OPINION

Whether appellant's conduct of striking Shannon Love in the parking lot of the Hot Rods and

Hoggs bar is a Class A misdemeanor or a third-degree felony turns on whether this conduct violated

the February 8, 2005, protective order.[1] Appellant claims that this conduct did not violate the

February 8th protective order and, therefore, is not a third-degree felony because the protective order

---

[1] *See* § 25.07(a), TEX. PEN. CODE ("in violation of an order" is an essential element of the offense of violating a protective order).

prohibited this conduct only against a member of appellant's "family or household" and Love was not a member of appellant's "family or household."[2] Appellant claims that his conduct is a Class A misdemeanor because he only dated Love and the protective order did not prohibit him from committing "dating violence."[3]

The magistrate signed the protective order at a hearing during which appellant personally appeared after his arrest "for an offense involving family violence." The protective order states that it was intended to protect "**SHANNON LOVE**, who is the victim of the offense." (Emphasis in bold and capitalization set out in the protective order). Its stated definition of "family violence" prohibited appellant from committing "family violence" only against a member of his "family or household." The protective order also prohibited appellant from "**communicating in a threatening or harassing manner directly with SHANNON LOVE**."[4] (Emphasis in bold and capitalization set out in the protective order).

The magistrate (Judge Maddock), who signed the protective order, described the procedure "in giving notice that a protective order has been issued."

> Q. [STATE]: Now, we were talking about the standard procedure that you have in giving notice that a protective order has been issued. Can you take the jury through that now?

---

[2] *See* § 71.004, TEX. FAM. CODE (defining "family violence").

[3] *See* § 71.0021, TEX. FAM. CODE (defining "dating violence").

[4] This apparently would include a prohibition against striking Love even without a consideration of the legal effect of the protective order's omission of "dating violence" in its definition of "family violence." *See Schmidt v. State*, 232 S.W.3d 66, 67 (Tex.Cr.App. 2007) (actual striking can also constitute a threat to harm).

A. [JUDGE MADDOCK]: Sure. When I do what we call magistration or arraignment, which is arraignments, that's what we blanket call it because it's a Class C. Again, it's actually the arraignment process. And I'm reading them why they're being held, what their charges are. If someone is also having a protective order, then I issue them the protective order at that point in time.

And what I would have done in this case is, Mr. Villarreal, please–I've entered a protective order and for the next 61 days, please do not go within 300 feet of any residence, business, or place of employment of Shannon Love. Specifically do not go within 300 feet of 2701 Jewell Drive, Arlington, Texas 76016, or 608 East Division, Arlington, Texas 76011. In addition, in no way should you threaten or harass Shannon Love, Ashley Love, Robert Love, Donna Love, Misty Love, or Brandon Lindley. Finally, do not be in possession of a firearm. If you violate any term of this protective order, you could find yourself with further charges pending against you. And that's how I do it day in, day out.

* * *

Q. And after you go through what the emergency protective order means and what is prohibited, is there any kind of acknowledgment that the person has to give?

A. Along with their copy, what happens is I make copies of–the original is on top of the file. I will make a copy and leave it in the folder, and I put it on top and I'll say, I need you to sign–and that would be the third page of this exhibit. Please sign the page I've given to you to acknowledge that I have given you your photocopy of the protective order.

Q. In State's Exhibit 4, there is an acknowledgment page, is there not?

A. Yes, there is.

Q. And is it signed?

A. It is signed by–I signed it down at the bottom at the return and at the top it is signed by Mr. Villarreal.

* * *

Q. And who is the person who is protected in that protective order?

A. Shannon Love and then the children that I called out and the parents.

Q. What type of protective order is this?

A. This would have been issued–could have been for a Class A or–this type of protective order could have been for a Class A or for a felony assault.

* * *

Q. And when we were talking in general terms about protective orders earlier, you were telling us that not all contact is prohibited, so that the parties, Mr. Villarreal and Shannon Love, would have been able to meet at a mutually agreeable place?

A. Yes.

Q. What is prohibited is any assaultive behavior at that place?

A. Right.

Q. If like in this instance Mr. Villarreal, when he received his emergency protective order, if he had had questions about that, is that something you would have addressed?

A. Yes.

Q. And do you have any notations or anything to indicate that he had any questions about what he was being given?

A. No.

The evidence supports the theory upon which the case was submitted to the jury-that appellant and Love had recently been or were dating when appellant struck Love in the parking lot of the Hot Rods and Hoggs bar, where they had been drinking most of the evening. There is no evidence that Love was or had been a member of appellant's "family or household" when this occurred.[5]

---

[5] The indictment alleged that Love was a member of appellant's "family or household" (not that they had been in a dating relationship) when appellant struck her in the Hot Rods and Hoggs parking lot. Appellant challenged this facially valid indictment (in particular, the allegation that Love was a member of appellant's "family or household") through a motion to quash the indictment, which the trial court denied. The State claimed in response to appellant's motion to quash that it could establish appellant's guilt by showing either that appellant and Love were in a dating relationship or that Love was a member of appellant's "family or household." The State eventually abandoned the indictment allegation that Love was a member of appellant's "family or household" with the remaining allegation being that appellant violated the protective order by committing "family violence" against Love when he struck her in the Hot Rods and Hoggs parking lot.

Appellant claims that he could not have violated the protective order because its definition of "family violence" did not include "dating violence," which is the theory upon which he was convicted. Appellant argues that the sufficiency issue is whether "the relevant definition of family violence is found in the protective order" and not whether the evidence would support a finding that appellant "engaged in conduct that might be covered by one or more definitions" of "family violence" contained in the provisions of the Family Code.

> It is axiomatic, but worth noting, that the State must prove Mr. Villarreal actually violated the protective order; it is not sufficient to show only that Mr. Villarreal engaged in conduct that might be covered by one or more definitions contained in [the provisions of the Family Code]. In other words, even if there is evidence of family violence, the State must still prove that the complained of conduct violated the terms of the protective order. Thus, the relevant definition of family violence is found in the protective order, and the protective order's definition does *not* include "dating violence."

(Citations to authority and to the record omitted; emphasis in italics in original).

I agree that the statute defining the offense required the State to prove "that the complained of conduct violated the terms of a protective order."[6] The issue, therefore, is whether the terms of the protective order, despite containing a definition of "family violence" that was not applicable to appellant's and Shannon Love's dating relationship, was reasonably specific enough to prohibit appellant from striking Shannon Love. *See Harvey v. State*, 78 S.W.3d 368, 371 (Tex.Cr.App. 2002) ("procedure for the issuance of the [protective] order requires that the person to whom the order applies will have (or at least will have been given) notice of its terms").[7] If it was, then appellant is

---

[6] *See* § 25.07(a) (defining offense of violation of a protective order); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (evidentiary sufficiency measured against the substantive elements of the offense as defined by state law).

[7] *Compare Ex parte Rhodes*, 974 S.W.2d 735, 740 (Tex.Cr.App. 1998) (an element of a

liable for the violation-of-a-protection-order offense for which he was convicted.

The protective order in this case clearly states that its issuance was necessary after appellant had been arrested for "an offense involving family violence" against Shannon Love. By specifically stating that the protective order was meant to protect Shannon Love and by specifically prohibiting appellant from, among other things, threatening and harassing Shannon Love, this protective order, despite any "defective" definition of "family violence," was reasonably specific enough to communicate to appellant that the protective order prohibited him from striking Shannon Love as he did on the night in question in the Hot Rods and Hoggs parking lot. That this protective order may not have informed appellant of the intricacies of the various definitions of "family violence" contained in the Family Code is of no consequence to the sufficiency analysis in this particular case.[8] The protective order was reasonably specific enough to communicate to appellant that the protective order was meant to protect Shannon Love from him which included a prohibition against striking her. For purposes of the sufficiency analysis in this case, that is all that was required.

---

constructive criminal-contempt conviction is a reasonably specific order) (citing and relying on *Ex parte Chambers*, 898 S.W.2d 257, 259 (Tex. 1995)).

[8] Appellant does not claim, for example, that he relied on the "family violence" definition in the protective order to believe that he would only be liable for a Class A misdemeanor when he struck Love in the Hot Rods and Hoggs parking lot. It should be noted that the protective order in this case states that a "violation of this order by commission of an act prohibited by the order may be a felony punishable by a fine of as much as $4,000 or by confinement in jail for as long as one year or both." This, however, reflects the punishment range for a Class A misdemeanor enhanced by a previous conviction for a "Class A misdemeanor or any degree of felony." *See* § 12.43(a), TEX. PEN. CODE. It does not reflect the punishment range for a third-degree felony. *See* § 12.33, TEX. PEN. CODE. In this case, appellant was convicted of a third-degree felony and he was sentenced, as an habitual offender with two prior felony convictions, to 60 years in prison. *See* § 25.07(g), TEX. PEN. CODE (offense of violating protective order is third-degree felony if the defendant "has violated the protective order by committing an assault"); § 12.42(d), TEX. PEN. CODE.

I, however, disagree with the Court's opinion to the extent that it could be read as deciding that the protective order did not reasonably convey this information to appellant but that "any reasonable person in appellant's position reading the protective order" should nevertheless have gleaned this information. *See* Maj. op. at 10 ("despite the deficient definition of 'family violence' on page two of the order, any reasonable person in appellant's position reading the protective order would have understood that it prohibited him from committing violent conduct against Love or her family"). I also disagree with the Court's opinion to the extent that it suggests that the person to whom a protective order is directed must actually know the contents of the protective order in order to be liable for violating it. *See id.*[9]

With these reservations, I join the Court's opinion.

Hervey, J.

Filed: April 29, 2009
Publish

---

[9] *See Harvey*, 78 S.W.3d at 373 ("The State does not argue that the appellant could be held liable without having some knowledge of the order. It does say that the Court of Appeals went too far in requiring that the appellant 'knew its provisions.' We think the State is right, for we find no such requirement in the procedures for protective orders. The requirements are only that the respondent be given the resources to learn the provisions; that is, that he be given a copy of the order, or notice that an order has been applied for and that a hearing will be held to decide whether it will be issued. The order is nonetheless binding on the respondent who chooses not to read the order, or who chooses not to read the notice and the application and not to attend the hearing."); *but see Rhodes*, 974 S.W.2d at 740 (an element of a constructive criminal-contempt conviction for violating a reasonably specific order is "the wilful intent to violate the order"); *Chambers*, 898 S.W.2d at 259.